IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

EARL DISHMAN,
ADAM WELLMAN,
ARLIE CRANE, and
UTILITY WORKERS' UNITED ASSOCIATION,
LOCAL 537, an unincorporated association,

                  Plaintiffs,

v.                                 CIVIL ACTION NO. 3:21-0066

WEST VIRGINIA-AMERICAN
WATER COMPANY, a corporation,

                  Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Plaintiffs Arlie Crane, Earl Dishman, Adam Wellman, and Utility Workers' United Association, Local 537's Motion for Summary Judgment (ECF No. 48) and Defendant West Virginia-American Water Company's Motion for Summary Judgment (ECF No. 50). For the reasons herein, Defendant's Motion is **GRANTED**, and Plaintiffs' Motion is **DENIED**.

**I. BACKGROUND**

Defendant West Virginia-American Water Company ("WVAWC") is a public utilities corporation operating in West Virginia. Am. Compl. ¶ 6, ECF No. 11. Plaintiff Utility Workers' United Association, Local 537 ("the Union") is the certified collective bargaining agent for WVAWC's Huntington District unit. *Id*. ¶ 4. Plaintiffs Earl Dishman, Adam Wellman, and Arlie

Crane were WVAWC Huntington District unit employees who were represented by the Union for collective bargaining purposes. *Id.* ¶ 8.

Until September 2018, the Utilities Workers Union of America, AFL-CIO, System Local 537 ("the predecessor Union") represented the WVAWC's Huntington employees for collective bargaining purposes. *Id.* ¶¶ 11-12. The predecessor Union was certified by the National Labor Relations Board ("NLRB") as the exclusive collective bargaining representative for those employees. *Id.* ¶¶ 11-12. On September 5, 2018, one of Defendant's employees filed a Petition for Decertification, leading the NLRB to decertify the predecessor Union and instead certify Plaintiff Union as the representative after elections. *Id.* ¶¶ 4, 12.

The predecessor Union had negotiated a collective bargaining agreement ("CBA") with Defendant. *Id.* ¶ 11. When the NLRB certified Plaintiff as the new collective bargaining representative, it ordered that, from the date of certification, WVAWC was legally forbidden to make any unilateral changes in the terms and conditions of employees. *Id.* ¶ 13-16. This "status quo" is required by law to remain in place between the Union and the Defendant until they either arrive at an impasse in their collective bargaining negotiations or agree on a new CBA. *Id.* ¶¶ 9, 14. During negotiations, WVAWC is required to honor the terms and conditions of the status quo stemming from the original CBA, which include a requirement that no discipline or discharge from employment may occur unless just cause for either action exists. *Id.* ¶ 16.

Three individuals, plaintiffs Earl Dishman, Adam Wellman, and Arlie Crane, were employees of WVAWC at the time of the original CBA and during the transition period. *Id.* ¶¶ 19-20. On July 30, 2020, these individuals were either disciplined or discharged, allegedly in violation of the just cause provision. *Id.* ¶¶ 26-27, 33-34, 40-41. Mr. Dishman was discharged, while Mr. Wellman and Mr. Crane were issued disciplinary letters. *Id.* ¶¶ 26, 37, 44. Since this

incident, Mr. Wellman is no longer employed by WVAWC, and WVAWC has removed the notice of discipline from Mr. Crane's record. Pls.' Mem. of Law in Supp. of Mot. for Summ. J., ECF No. 49 at 4 n.1. In April 2022, WVAWC and the Union ratified a new CBA. *Id*. at 3; Def.'s Mem. of Law in Supp. of Mot. for Summ. J., ECF No. 51 at 5.

Plaintiffs filed suit on January 26, 2021, alleging a violation of the terms and conditions of their employment. Compl., ECF No. 1; *see* Am. Compl. As of their Amended Complaint, Plaintiffs presented two theories for recovery: (1) that they could enforce the status quo created under the National Labor Relations Act ("NLRA") as a contract implied-in-law and (2) alternatively that they had an enforceable "limited express agreement" with WVAWC. Am. Compl. ¶¶ 16-18. The Court dismissed Plaintiffs' claim concerning the status quo, as NLRB precedent demonstrates that the status quo obligation is statutory—not contractual—in nature. Mem. Op. and Order Den. Def.'s Mot. to Dismiss, ECF No. 18 at 11-12. However, this Court found that the allegations in Plaintiffs' Amended Complaint created "a factual issue about what parties have agreed to, and whether a contract is in existence." *Id*. at 13. Both Plaintiffs and Defendant have filed Motions for Summary Judgment (ECF Nos. 48 & 50) on the issue of whether a contractual agreement existed concerning the just cause standard at the time of the disciplinary incident.

## II. STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most

favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

And yet, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has not met the burden of proof on an essential element of his or her case after allowing adequate time for discovery. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy the burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III. ANALYSIS

**A. Mr. Wellman and Mr. Crane**

As a preliminary matter, all parties agree that the claims of Mr. Wellman and Mr. Crane have been rendered moot by subsequent events. Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 4 n.1; Def.'s Reply in Supp. of Def.'s Mot. for Summ. J. at 3-4; Pls.' Reply to Defs.' Resp. to Pls.' Mot. for Summ. J. at 1. Mr. Wellman is no longer employed by WVAWC, and WVAWC has removed the notice of discipline from Mr. Crane's record. *See* Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 4. Thus, neither of them has a current cognizable case or controversy which this Court could adjudicate. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021) (discussing mootness). The Court therefore **GRANTS** the Defendants' unopposed Motion for Summary Judgment as to Mr. Wellman and Mr. Crane.

### B. Legal Background: LMRA Section 301 Requirements

Turning to the remaining claim, Section 301 of the Labor Management Relations Act ("LMRA") requires that Plaintiffs demonstrate that there was a violation of a contract between an employer and a labor organization. *See* 29 U.S.C. § 185(a). Section 301(a) "provides for suits in the district courts for violation of collective-bargaining contracts between labor organizations and employers." *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 561 (1976). Section 301 broadly encompasses violation of contracts struck between employers and labor organizations, not just violation of CBAs. *Retail Clerks Intern. Ass'n, Loc. Unions Nos. 128 and 633 v. Lion Dry Goods, Inc.*, 369 U.S. 17, 26 (1962) (concerning a strike settlement agreement); *Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Facetglas, Inc.*, 845 F.2d 1250, 1253 (4th Cir. 1988) (concerning an election agreement). Courts apply the federal common law of contracts when adjudicating the existence of a contract for the purposes of Section 301, often looking to the Restatements to determine general principles of contract law. *Plumbers & Pipefitters Loc. 625 v. Nitro Constr. Servs., Inc.*, 27 F.4th 197, 200 (4th Cir. 2022).

The parties do not dispute that no CBA existed between them at the time of the disciplinary incident. Am. Compl. ¶ 15; Def.'s Mem. of Law in Supp. of Mot. for Summ. J at 9. Plaintiffs claim that a separate "limited express agreement" was struck between the parties on the issue of requiring just cause for disciplining employees, prior to the disciplinary incident, which this Court may treat as a contract for the purposes of Section 301. Pls. Mem. of Law in Supp. of Mot. for Summ. J. at 9. However, the NLRB has held that tentative agreements made during collective bargaining negotiations are not binding on the parties until a final bargaining agreement is reached. *See Sec. Walls, Inc. & Int'l Union, Sec. Police & Fire Pros. of Am.*, 365 NLRB No. 99, 5 (June 15, 2017); *Taylor Warehouse Corp.*, 314 NLRB 516, 517 (1994), *enf'd* 98 F.3d 892 (6th Cir. 1996)

("Under Board law, tentative agreements made during the course of contract negotiations are not final and binding."). Yet, the Fourth Circuit has noted that parties' manifestations of intent may create a contract despite the absence of a completed CBA. *See Cumberland Typographical Union No. 244 v. Times & Alleganian Co.*, 943 F.2d 401, 405 (4th Cir. 1991). Similarly, in some situations an employer may be bound by a contract it has not signed if it has, by its conduct, manifested an intent to abide by it. *N.L.R.B. v. Haberman Const. Co.,* 641 F.2d 351, 357-58 (5th Cir. 1981); *Super Save*, 273 NLRB 20, 29 (1984). Therefore, finding that it was theoretically possible for a "limited express agreement" struck during the CBA-bargaining process to be enforced under Section 301, this Court allowed Plaintiffs' disputed factual claim of an enforceable "limited express agreement" to survive Defendant's Motion to Dismiss and proceed to discovery. Mem. Op. and Order Den. Def.'s Mot. to Dismiss at 13.

**C. Existence of a "Limited Express Agreement" on the Issue of Discipline for Just Cause**

Plaintiffs have argued that the Union had a "limited express agreement" with WVAWC on the issue of requiring just cause to discipline or discharge employees. Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 8-14. In support, they cite the fact that the language concerning just cause was never altered over the course of the four-year negotiation period by either party and argue that courts have adjudicated contractual disputes under Section 301 in analogous situations involving limited issues on which unions and employers have contracted during the transitional process between prior and successor unions. *Id*. at 8-10. In response, WVAWC has asserted that it was merely following the statutory status quo during the disciplinary incident, that no such agreement existed, and that the idea of a "limited express agreement" contravenes well-established labor and contract law principles. *See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 14.

This Opinion considers the arguments advanced by the parties as to the statutory status quo, the Plaintiffs' cited caselaw concerning their theory of contracting, and finally, the evidence on the record as to the existence of a "limited express agreement" contract. For the following reasons, the Court finds that no such contract existed between the parties, and **GRANTS** summary judgment for Defendant.

### a. Regardless of whether WVAWC was adhering to the statutory status quo at the time of the disciplinary incident, this Court may adjudicate any existing contract between WVAWC and the Union under Section 301.

The parties argue bitterly over whether the statutory status quo maintenance required of WVAWC under NLRB precedent was, in fact, what WVAWC was adhering to at the time of the disciplinary actions. *See* Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 13; Def.'s Resp. in Opp'n to Pls.' Mot. for Summ. J. at 3; *NLRB v. Katz*, 369 U.S. 736, 743-47 (1962). WVAWC states that its "application of [the just cause] standard occurred because of a legal requirement [imposed by the NLRB] and not a contractual requirement." Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 15. In addition to disputing that WVAWC did employ the just cause standard, Plaintiffs argue that WVAWC was obligated under a "limited express agreement" on the issue of just cause to employ that standard. Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 13. It is disputed whether Plaintiffs believe WVAWC was *additionally* obligated to employ the just cause standard under the statutory status quo.[1] *See id*.

---

[1] In its Response to Plaintiffs' Motion for Summary Judgment, Defendant insists that Plaintiffs believe "WVAWC's duty to maintain the status quo on just cause discipline/discharge was somehow extinguished by complying with its duty to bargain through the exchange of proposals and counterproposals for an initial collective bargaining agreement." Def.'s Resp. in Opp'n to Pls.' Mot. for Summ. J. at 5, 7-9. The Court is less certain that Plaintiffs unequivocally argue that

These arguments are irrelevant to the Court's decision-making. The parties agree that WVAWC had a statutory obligation to maintain the status quo during the negotiation period. *See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 15; Pls.' Resp. to Def.'s Mot. for Summ. J. at 3. This Court has held that it cannot enforce the statutory status quo required by the NLRB under Section 301 as an implied contract. Mem. Op. and Order Den. Def.'s Mot. to Dismiss at 11-12. Whether or not WVAWC was faithfully adhering to the status quo does not implicate the issue contested here: whether a limited contractual agreement existed between the parties on the issue of just cause at the time of the disciplinary actions.[2] If such an agreement existed, this Court may enforce it under Section 301, regardless of whether WVAWC subjectively believed it was following that agreement or the status quo obligation at the time of the incident. Therefore, while a factual dispute exists as to the policy which WVAWC believed it was following at the time of the disciplinary incident, that dispute is not material.

### b. The caselaw cited by Plaintiffs in support of their theory of contracting is not analogous to the case at hand.

The Court finds that, while it might be possible for the Union and WVAWC to have negotiated an enforceable express contractual agreement on a limited set of issues prior to ratifying the CBA

---

WVAWC no longer had a duty to maintain the statutory status quo; rather, the Court reads Plaintiffs' arguments as stating that, regardless of whether WVAWC had a statutory obligation to maintain the just cause standard as part of the status quo, they certainly had a contractual obligation to do so under a "limited express agreement." *See* Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 13; Pls.' Resp. to Def.'s Mot. for Summ. J. at 3.

[2] WVAWC notes that several cases cited by Plaintiffs involve parties behaving as though they had a contract on a specific issue, resulting in courts concluding that a contract existed between them. *See* Def.'s Resp. in Opp'n to Pls.' Mot. for Summ. J. at 5, 13-14 n.10. The Court first finds that Plaintiffs were not arguing that Defendant followed the just cause standard and that therefore they had a contract; this would undermine Plaintiffs' entire cause of action against Defendant. Moreover, for the reasons discussed below, the Court finds the cited cases to be inapplicable to the present dispute.

(other than through the well-recognized concept of an interim agreement[3]), Plaintiffs have not provided persuasive evidence that any such contract has ever been adjudicated by a court on an analogous issue.

Plaintiffs cite several cases to support their theory of contracting, none of which are analogous to the instant action. *See* Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 8-9. Two of these cases deal with disputes concerning arbitration agreements, wherein courts found that a pattern of conduct utilizing arbitration procedures evinced an intent to continue to be bound by a prior, expired arbitration agreement. *See Cumberland,* 943 F.2d 401; *Int'l Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers-Loc. 1603 v. Transue & Williams Corp.*, 879 F.2d 1388 (6th Cir. 1989). Plaintiffs' heavy reliance on *Cumberland* is misplaced. *See* Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 8; Pls.' Resp. to Def.'s Mot. for Summ. J. at 2, 8. *Cumberland* concerned a previously bargained-for lifetime employment agreement, which the plaintiffs claimed was violated by the employer during the transitional negotiation period between CBAs. 943 F.2d at 403. The prior CBA had stated that the lifetime employment agreement would "continue in force through succeeding agreements unless changed by mutual agreement between parties." *Id*. When this agreement was allegedly violated by the employer, the Union attempted to take their grievance to arbitration, under the prior CBA's grievance process, but the employer objected. *Id*.

---

[3] Employers have a duty to bargain collectively with employee representatives under Section 8(a)(5) of the NLRA. 29 U.S.C. § 158. However, unions and employers may reach a good faith impasse during contract negotiations. *Tecnocap, LLC v. NLRB*, 1 F.4th 304, 314-15 (4th Cir. 2021). When this occurs, employers may unilaterally institute changes or negotiate interim agreements with unions during the impasse. *Id*.; *Brown v. Pro Football, Inc.*, 518 U.S. 231, 244-45 (1996). Such interim agreements are enforceable under Section 301. *See, e.g.*, *Adkins v. M&G Polymers USA, LLC*, 2006 WL 659501 at *2 (S.D.W. Va. Mar. 13, 2006). Regardless, Plaintiffs have not alleged any such interim agreement, and the Court agrees that the interim agreement framework does not fit the facts of the case, as the parties never reached an impasse. *See* Am. Compl. ¶ 15 (stating no impasse had been reached).

The *Cumberland* Court found that it had jurisdiction under Section 301 to hear the case, as the Supreme Court had held that "termination of the collective bargaining agreement does not automatically extinguish the duty to arbitrate grievances which arose under that contract." *Id*. at 404-05 (citing *Nolde Bros. Inc. v. Bakery & Confectionery Workers Union*, 430 U.S. 243, 250-51 (1977)). *Cumberland* went on to determine that the duty to arbitrate had arisen under the expired CBA, as it covered the lifetime employment agreement while the CBA was in effect and the lifetime employment agreement itself contemplated continuance after the CBA expired. *Id*. at 405. Additionally, the court noted that the parties had evinced an intent to abide by the expired arbitration procedures post-expiration: the employer included the arbitration agreement in its unilateral final offer and both parties used the arbitration process to deal with a subsequent grievance. *Id*. at 405-06. Pointedly, the *Cumberland* court only enforced the provision because it concerned "arbitration of rights vested in the previous collective bargaining agreement"—the court did not enforce the arbitration agreement as a new "limited express agreement" created by the parties during the transition negotiations, as Plaintiffs seek to have enforced here. *Id*.

Plaintiffs next turn to inapposite caselaw concerning interim agreements, such as *Taft Broadcasting Co. v. NLRB*, 441 F.2d 1382 (8th Cir. 1971), in which the Eighth Circuit found an employer to be bound by an interim agreement during the CBA negotiation process. Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 8. The interim agreement in *Taft* consisted of a letter in which the employer outlined its intent to unilaterally implement its final offer. 441 F.2d at 1383. Plaintiffs also cite *United Paperworkers International Union v. International Paper Co.*, in which another employer unilaterally implemented a final offer and the court found that an interim contract existed. 920 F.2d 852, 855 (11th Cir. 1991); Pl.'s Resp. to Defs.' Mot. for Summ. J. at 6. *United Paperworkers* could broadly stand for the proposition that courts may enforce interim

agreements under Section 301. *See* 920 F.2d at 860. However, here there is no evidence of an interim agreement; unlike in *Taft* and *United Paperworkers*, there is no agreement reduced to writing, no manifestation of intent by the employer to implement specified managerial practices, nor any overt signification by the employer of how the Union could assent.

Accordingly, none of the cited situations are analogous to the present issue, wherein the parties are debating a single clause concerning managerial practices which the Plaintiffs seek to enforce as a new contract created during the CBA negotiations. *See* Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 13. Nonetheless, the Court need not reach the issue as to whether any contract could exist in the manner propounded by Plaintiffs, as the record demonstrates no such contract was created here.

### c. The evidence before the Court does not demonstrate the existence of a contract between the Union and WVAWC on the issue of just cause for discipline or discharge.

Despite the theoretical possibility that a court could adjudicate a "limited express agreement" between a collective bargaining agent and an employer during a transition period under Section 301, there is insufficient evidence that any such contractual agreement was struck here. The parties agree that there are no material facts in dispute but vary in their interpretations as to whether the record indicates that a "limited express agreement" existed between them. *See* Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 14-15; Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 12. Plaintiffs' argument is premised on the idea that the provision concerning discipline for just cause was proffered by both sides from the start of negotiations, never altered over the course of those negotiations, and that WVAWC always intended the provision to be included in the final CBA.

Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 4-5, 10-11, 14-15. Or, in other words, that Defendant intended its proposal on the issue of just cause to bind it from the outset, if the Union accepted that proposal, thus creating a limited contract on that issue from the start of negotiations. *See* Pls.' Reply to Def.'s Resp. to Pls.' Mot. for Summ. J. at 2.

Throughout the four-year negotiation period, the Union and WVAWC exchanged dozens of proposed CBAs, all of which included the just cause provision. *See* Def.'s Mot. for Summ. J. at Ex. 18, Ex. 19. However, each proposed CBA submitted by WVAWC came with a conspicuous warning: "[WVAWC] reserves the right to add to, delete from, or revise these proposals during the course of negotiations and all proposals are without prejudice to [WVAWC]'s position in any other proceedings." *Id*. at Ex. 18. Plaintiffs dismiss this language as "mere surplusage" indicating that "proposals can be altered as negotiations progress." Pls.' Resp. to Def.'s Mot. for Summ. J. at 7. The Court agrees with Plaintiffs to the extent that the language clearly indicates that negotiations were on-going concerning the contents of the agreements. In fact, the disclaimer conforms with established contract law principles—manifested willingness to bargain is not an enforceable offer and parties may express an enforceable lack of intention to be bound. *See* Restatement (Second) of Contracts §§ 21b, 26.

In their Motion, Plaintiffs state that their "position is that from the outset of the parties' negotiations, WVAWC always intended that the just cause for discipline standard *would be part of any agreement reached by the parties*." Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 14 (emphasis added). Therefore, Plaintiffs conclude that they had a limited contract with WVAWC "from the outset" on the issue. *Id*. This reveals a basic misunderstanding of contract law. Intent to contract must be *present* intent; courts will not bind parties to hypothetical future agreements while contract negotiations are on-going. *See* Restatement (Second) of Contracts § 26 ("A

manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent."); Williston on Contracts, 4th § 4:10.

The Union's stated position therefore undermines its own argument—the fact that WVAWC "always intended" the just cause provision "would be *part of any agreement reached*" demonstrates only that WVAWC entered contract negotiations with outcomes in mind. This position is presumably the same one any party is in when it begins contract negotiation. Parties are not bound by goals they had at the point of entering contract negotiations, only by provisions which they have affirmatively contracted to at the conclusion of those negotiations. *See* Restatement (Second) of Contracts § 21 (discussing necessity of intent to be bound). Otherwise, every person seeking to contract would be immediately bound by whatever intention they had at the outset of contract negotiations, which the other party to those negotiations could enforce against them without providing consideration, in contravention of basic contract principals. *See* Restatement (Second) of Contracts § 71. In this questionable schema, the Union would have no need for a CBA—as long as they agreed with the expressed intentions of WVAWC, they could hold WVAWC to those intentions without providing anything in return.

Moreover, while the record indicates that the specific phrase at issue was never altered, the record equally shows contested debate over the broader proposed CBA article that the six-word phrase was contained within—"Article Two: Management Rights." Union negotiators have testified in deposition that the Management Rights section was in flux throughout the four-year negotiation process.[4] Def.'s Mot. for Summ. J., Ex. 2, Gregory Lanham Dep. at 86:17-22; Ex. 4,

---

[4] Plaintiffs make much of the fact that WVAWC's sister company, Pennsylvania American Water Company ("PAWC"), engaged in more contentious negotiations with the Union as it represented their workers. Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 11-12. Plaintiffs' brief

Samuel Pasquarelli Dep. at 36:12-21, 37:21-24, 38:1-2; Ex. 6, Joshua Burton Dep. at 22:20-24, 23:1-18. WVAWC's negotiators concur. *Id*. at Ex. 7, Lu-ann Glaser Dep. at 124:22-25, 125:1. Each proposal on Management Rights exchanged between the parties contained differing terms, and therefore each exchange constituted a counteroffer. *See Id*. at Exs. 18 & 19; Restatement (Second) of Contracts § 59. Replying to an offer with a counteroffer is not an acceptance of the initial offer. *See id*. §§ 39, 59; *Sharp Electronics Corp. v. Deutsche Financial Servs. Corp.*, 216 F.3d 388, 395 (4th Cir. 2000) ("Acceptance conditioned on the modification of terms in an offer generally constitutes a rejection of the offer and becomes a counter-offer that the original offeror must accept before a valid contract is established."). Rather, counteroffers are treated as rejections of initial offers, and therefore may be rescinded at any time prior to acceptance. *See id*.; Restatement (Second) Contracts § 42 cmt. a ("[T]he ordinary offer is revocable even though it expressly states the contrary, because of the doctrine that an informal agreement is binding as a bargain only if supported by consideration."). Therefore, no unqualified acceptance of the Management Rights provision of the proposed CBAs existed during negotiations.

Additionally, the Court finds that the course of conduct and communication between the parties weighs against determining that the Union and WVAWC came to an express and limited contractual agreement on the issue of just cause. It is axiomatic that the parties must have manifested mutual assent to contract. Restatement (Second) of Contracts § 17. "Manifestation of

---

emphasizes that the two employers used the same negotiator—Lu-ann Glaser—and that in the PAWC negotiations Ms. Glaser repeatedly removed provisions of proposals and conditioned them upon acceptance of broader proposed CBAs. *Id*. Plaintiffs conclude that the lack of such revocations and express provisions here denotes WVAWC's intent in their negotiations with the Union to have formed a "limited express agreement" at the time proposals were promulgated. *Id*. While courts consider the course of conduct between parties in determining whether there was mutual assent to contract, this Court has not found any evidence to support the proposition that courts should consider the course of conduct between the Union and a third party negotiating an entirely different contract when adjudicating the existence of a contract between the parties at bar.

assent may be made by words or by any other conduct." *Id*. § 2b. Throughout their negotiation process, the Union and WVAWC adopted several methods for indicating or communicating that an issue had been resolved, none of which was applied to the Management Rights section. For example, WVAWC had developed a system for indicating which aspects of their proposed CBAs had reached "tentative agreement." First, the parties to the negotiation marked such sections with a "TA" or "tentative agreement." Def.'s Mot. for Summ. J. at Ex. 2, Gregory Lanham Dep. at 25:10-19. Second, later drafts circulated by WVAWC would include a highlighted notice next to provisions which had reached tentative agreement. *See id*. at Ex. 18, Management Rights Proposals. Third, a "score sheet" was issued by WVAWC which listed areas of negotiation which had reached tentative agreement (or not). *Id*. at Ex. 20. While tentative agreements were reached on many other sections of the CBA prior to ratification, at no point in this process was the Management Rights section labelled "tentative agreement," nor is there any other written record of agreement on the issue.[5] *See id*. at Exs. 18 & 20. Likewise, Union negotiator Samuel Pasquarelli has testified that no oral agreement was ever reached concerning Management Rights. *Id*. at Ex. 4 at 74:18-21.

Furthermore, the Union has submitted to the Court evidence of an agreement between the parties concerning the issue of safety glasses. Pls.' Resp. to Def.'s Mot. for Summ. J. at Supp. App., Ex. 7a. While the Union has cited the safety glasses agreement as evidence that the parties came to separate but related understandings on individual issues during the negotiation process—which were then marked as "tentative agreements" by WVAWC—the Court finds that

---

[5] Even if a tentative agreement had been reached, NLRB precedent indicates that tentative agreements are not binding. *Taylor Warehouse*, 314 NLRB at 517. Lack of a tentative agreement is cited here by the Court merely as evidence of on-going debate and discussion over the Management Rights section, rather than to imply that were a tentative agreement reached on the issue the Union could have enforced it.

this evidence undermines the Union's position with regards to the just cause provision.[6] *See id*. at 7-8. The limited agreement on safety glasses was reduced to writing in a separate, signed document. *Id*. at Supp. App., Ex. 7a. No such document has been produced by the Union concerning the issue of just cause for discipline or discharge. Here, the separate safety glasses agreement demonstrates the course of conduct by which the Union and WVAWC would construct and agree to limited, conditional agreements on specific issues during the negotiations process. The Court cannot find that this method was ever employed by the parties on the issue of just cause for discipline or discharge. The Court finds this evidence of the course of conduct between the parties persuasive that no mutual assent was manifested on the issue of the Management Rights section or the just cause provision therein.

In summation, the undisputed material facts before the Court demonstrate that the Union and WVAWC had no contract—"limited express agreement" or otherwise—as to the issue of just cause for discipline or discharge at the time of the July 30, 2020 disciplinary incident involving Mr. Dishman, Mr. Wellman, and Mr. Crane. Defendant WVAWC is therefore entitled to summary judgment as a matter of law as to Plaintiffs' remaining claim concerning Mr. Dishman's discharge.

## IV. CONCLUSION

For the foregoing reasons, Defendant WVAWC's Motion for Summary Judgment (ECF No. 50) is **GRANTED**, and Plaintiffs Arlie Crane, Earl Dishman, Adam Wellman, and Utility Workers' United Association, Local 537's Motion for Summary Judgment (ECF No. 48) is **DENIED**. The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and

---

[6] As it is not at issue in this case, the Court does not determine whether the safety glasses agreement in Plaintiffs' Supplemental Appendix, Exhibit 7a would be enforceable under Section 301. Rather, the Court looks to the safety glasses agreement as evidence of prior course of conduct between the parties when determining whether a similar agreement existed with regards to just cause for discipline or discharge.

any unrepresented parties.

    ENTER:    October 14, 2022

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE